UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO: 1:16-CV-00074-JHM

JOHN DOE                                                                                    PLAINTIFF

V.

GEORGE DORDONI                                                                   DEFENDANT

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [DN 82], Plaintiff's Motion to Exclude Expert Witness Testimony of David Ware [DN 81], and Defendant's Motion to Exclude Testimony of Plaintiff's Expert, Sanjay Sethi [DN 85]. Fully briefed, these matters are ripe for decision. For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED**, Plaintiff's Motion to Exclude Expert Witness Testimony is **DENIED** as moot, and Defendant's Motion to Exclude Expert Witness Testimony is **DENIED** as moot.

### I.     BACKGROUND

The parties do not dispute the essential facts of this case. John Doe[1] was born in Jeddah, Saudi Arabia and is a citizen of Pakistan. [DN 1 ¶ 9]. In 2013, Doe left Pakistan and came to the United States to pursue an engineering degree. [*Id.* ¶ 6]. He applied and was accepted to Western Kentucky University ("WKU"). [*Id.*]. While Doe was a student at WKU, he had all the necessary documentation for proof of his legal admission into the U.S. and his enrollment at an American university. [*Id.* ¶ 7–8]. Specifically, Doe held a valid F-1 Visa—a nonimmigrant visa for individuals wishing to study in the U.S. [*Id.*].

---

[1] The Court previously granted Plaintiff's request to proceed under a pseudonym due to his fear of religious persecution. [DN 16; DN 21].

Although a Muslim, after Doe came to the U.S., he began attending Christian church services. [DN 84-1 at 51:13–19]. He largely kept his interest in Christianity to himself. [DN 1 ¶ 11]. He eventually confided this to some of his Muslim friends, who warned him of possible negative consequences under Islamic law. [*Id.* ¶ 12]. Doe also confided in his uncle who later disclosed Doe's secret to Doe's father, which led to Doe's father withdrawing his financial support. [*Id.*]. Doe alleges that because of his father's decision, he was unable to enroll in classes for the Spring 2015 semester. [*Id.*].

In early 2015, Doe's father requested that he return to Saudi Arabia. [DN 84-1 at 55:9–25]. Doe initially believed he needed to return home because his father and mother were separating. [*Id.*]. Before traveling, Doe sought the advice of George Dordoni. [DN 1 ¶ 15]. Dordoni is WKU's Senior International Student and Scholar Advisor. [DN 82-1 at 4]. He describes himself as an individual with "almost thirty years of experience in recruitment of international students, international student immigration regulations, and international student advising." [*Id.*].

During their meeting, Doe asked Dordoni how he could take a leave of absence from school while still maintaining his status as a student. [DN 1 ¶ 15]. Doe alleges that Dordoni counseled him on the process of submitting his Form I-20 to obtain a Certificate of Eligibility for Non-Immigrant (F-1) Student status. [*Id.* ¶ 17]. An I-20 is a document that certifies an international student is currently enrolled at an American university and is thus eligible to return to the U.S. on a student visa. [DN 84-2 at 57:4–9]. A valid Form I-20 allows a student to travel abroad for five months before returning. [*Id.* at 61:1–7]. Doe alleges that, on this basis, Dordoni assured him he could leave the U.S. to visit his family abroad and that he would be granted re-entry to complete his studies at WKU. [DN 1 ¶ 18].

2

Doe contends that, in reliance upon Dordoni's advice, he left the U.S. on February 14, 2015, and traveled to Saudi Arabia. [*Id.* ¶ 19]. Doe states that he was forcibly detained by his family for the purpose of re-indoctrinating him into the teachings of Islam. [*Id.* ¶ 20]. Doe says he was physically punished when he failed to follow his father's orders. [*Id.*]. Eventually, three months later, Doe feigned resignation of his interest in Christianity and his father consented to his return to the U.S. and WKU. [*Id.* ¶ 21].

In early May 2015, while still in Saudi Arabia, Doe emailed Dordoni to see if he was cleared to return to the U.S. [*Id.* ¶ 22]. Dordoni, in response, checked Doe's status on a program known as iStart. iStart, also known as Sunapsis, is a software program used by WKU to track the status of international students enrolled at the university. [DN 84-2 at 29:20–25]. iStart operates internally and is designed to interface with the Student and Exchange Visitor Information System ("SEVIS"), a government-operated computer program under the control of Immigration and Customs Enforcement ("ICE"). [*Id.* at 27:9–23; 29:25–30:3]. The government uses SEVIS to track the status of international students within the U.S. The compatibility of the iStart program with SEVIS allows the government and WKU to exchange international student information and records. [*Id.*].

In February 2015, WKU learned that iStart was not updating student records in SEVIS because of a glitch in iStart. [*Id.* at 66:12–22]. On February 23, 2015, Dordoni discovered that certain students' records that were input into iStart had not synced correctly with SEVIS. [*Id.* at 70:14–24]. Dordoni states that the glitch affected 1,039 student records. [*Id.* at 73:3–5]. Various WKU officials attempted to correct the glitch and resolve the issue. [*Id.* at 67:2–5]. By March 2015, Dordoni believed the issue was resolved. [*Id.* at 72:2–9]. Dordoni checked a random selection of student records and, upon review, confirmed that the records were correct. [*Id.* at

74:1–5]. Based on the review of those random "few" student records, Dordoni concluded that the fix implemented by WKU IT corrected all affected records. [*Id.* at 74:3–18].

When Dordoni checked Doe's status in iStart in May, the program reflected that he was still an active student and was able to re-enter the country. [*Id.* at 29:20–25]. Dordoni did not check SEVIS to confirm that it had corresponding information. Based on his check of the iStart records, Dordoni confirmed to Doe that his I-20 remained active and that he was set to return to the U.S. [DN 1 ¶ 23].

Doe flew back to the U.S. on May 17, 2015, arriving at Dulles International Airport in Washington, D.C. [*Id.* ¶ 24]. Upon arrival, Doe was directed to secondary inspection, where a U.S. Customs and Border Patrol ("CBP") officer told him he would not be allowed in the country because he was no longer registered as a university student. [*Id.*]. The information contained in SEVIS incorrectly characterized Doe's status as "inactive" and his I-20 was terminated on April 27, 2015 due to "failure to enroll." [DN 82, Exhibit J]. Doe alleges that because of his SEVIS status, he was treated as an illegal immigrant and immediately detained. [DN 1 ¶ 28]. Thereafter, Dordoni took several steps to try to remedy Doe's incorrect SEVIS status. [DN 82-1 at 8].

The CBP officer handling Doe's case asked whether there was any other basis upon which he could be allowed into the U.S., otherwise, the officer explained, Doe would be deported. [DN 84-1 at 112:6–10]. Fearing deportation, Doe told the officer about his conversion from Islam to Christianity. [*Id.* at 113:4–10]. Doe testified that he told the officer that he did not want to go back to Saudi Arabia because of what happened to him while there. [*Id.* at 114:24–115:2]. Based upon his statements to CBP, Doe was subjected to the asylum interview process and was detained.

Doe spent the night of May 17, 2015, at the airport. [*Id.* at 119:1–6]. Thereafter, he was transferred to an ICE holding facility in Farmville, Virginia. [*Id.* at 119:7–8, 119:21–24]. Doe

4

was paroled from immigration custody on June 15, 2015. [DN 84-5 at 67]. Doe ultimately obtained asylum status making him a lawful permanent resident. [DN 84-6; DN 84-1 at 143:19–21].

In May 2016, Doe filed this lawsuit against Dordoni. [DN 1]. He asserts a claim for negligence. [*Id.* ¶¶ 33–38]. As support, Doe states that Dordoni negligently provided false and misleading information to SEVIS regarding his status as a student enrolled at WKU, which caused the wrongful termination of his student visa and resulted in Doe's arrest and detention for a period of one month. [*Id.* ¶¶ 36–37]. Following discovery, the parties filed several motions. Dordoni filed his Motion for Summary Judgment and accompanying memorandum setting forth four separate bases for summary judgment. [DN 82-1]. Dordoni also filed his Motion to Exclude Testimony of Plaintiff's Expert, Sanjay Sethi arguing that Sethi is not qualified to testify as an expert on student immigration issues and that his testimony would be biased based on his prior relationship with Doe. [DN 85]. Doe filed his Motion to Exclude Expert Witness Testimony of David Ware claiming that Ware's testimony is not supported by good grounds and is based on inadmissible hearsay. [DN 81].

## II.  STANDARD OF REVIEW AND LAW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying the portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

Dordoni moves the Court to grant summary judgment in his favor as to Doe's negligence claim. He asserts four independent bases upon which the Court may award him summary judgment: (1) he is entitled to qualified official immunity because the acts he was performing were discretionary and carried out in good faith [DN 82-1 at 12–15]; (2) he acted with reasonable care and thus did not breach any duty owed to Doe [*Id.* at 15–17]; (3) Doe's asylum claim is an intervening act that constitutes a superseding cause [*Id.* at 18–21]; and (4) Doe failed to prove he suffered any damages [*Id.* at 21–23].

Because this case is before the Court on diversity jurisdiction, Kentucky law governs. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). Under Kentucky law, to succeed on a negligence claim, Doe must establish that: (1) Dordoni owed a duty of care to Doe; (2) Dordoni breached his duty; and (3) the breach proximately caused Doe's damages. *Estate of*

*DeMoss v. Eli Lilly & Co.*, 234 F. Supp. 3d 873, 880 (W.D. Ky. 2017) (citing *Vanden Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 741 (W.D. Ky. 2014).

Doe's negligence claim is brought against Dordoni individually. As Dordoni's first argument in support of support judgment, he argues that he is entitled to qualified official immunity because he is a public official, he acted in good faith, and all his challenged acts or omissions in advising Doe as to his immigration status were discretionary. [DN 82-1 at 12]. Doe responds that Dordoni's actions were ministerial, not discretionary, thus precluding the applicability of qualified official immunity. [DN 92 at 4–5].

In Kentucky, when an employee of the state is sued in his individual capacity, as here, that employee enjoys qualified official immunity, "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citing 63C AM. JUR. 2D *Public Officers and Employees* § 309 (1997)). As such, application of immunity "rests not on the status or title of the officer or employee, but on the [act or] function performed." *Id.* at 521 (citing *Salyer v. Patrick*, 874 F.2d 374 (6th Cir. 1989)).

A determination of immunity depends upon classifying the challenged acts in one of two ways: discretionary or ministerial. *Haney v. Monskey*, 311 S.W.3d 235, 240 (Ky. 2010). Qualified official immunity applies only where the challenged act is one that is discretionary in nature. *Yanero*, 65 S.W.3d at 521. Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Id.* at 522 (citing 63C AM. JUR. 2D § 322). To further explain, discretionary acts are those that "necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney*, 311 S.W.3d at 240. Discretion in the performance

7

of an act exists "when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Id.* (citing *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959)). However, "[a]n act is not necessarily 'discretionary' just because the officer performing it has some discretion with respect to the means or method to be employed." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citing *Franklin Cnty. v. Malone*, 957 S.W.2d 195, 201 (Ky. 1997)).

Conversely, immunity does not apply to "the negligent performance of a ministerial act, *i.e.,* one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citing *Malone*, 957 S.W.2d at 201).

Because of this framework, the type of act performed determines if the qualified official immunity defense applies. *Ritchie v. Turner*, 559 S.W.3d 822, 831 (Ky. 2018) (citing *Yanero*, 65 S.W.3d at 521). The Kentucky Supreme Court has noted that although these oft quoted guidelines for classifying acts as discretionary or ministerial appear simple at first glance, the analysis is often more demanding. *Haney v. Monskey*, 311 S.W.3d 235, 240 (Ky. 2010). Because few challenged acts will ever fit neatly into one category or the other, Kentucky courts look at the *dominant* nature of the act. *Id.*

Doe does not argue that Dordoni's actions were outside of his authority or that he acted with bad faith. The issue the Court confronts in this analysis is narrow: whether Dordoni's advising of Doe as to his immigration status was a discretionary or ministerial function. Doe's Complaint alleges Dordoni owed him a duty of reasonable care "in advising him and guiding him through the I-20 process," "in rendering advise [*sic*] to him regarding his immigration status and

8

eligibility to re-enter the U.S.," and "to provide accurate information to [SEVIS] certifying his active status as a student at WKU." [DN 1 ¶¶ 34–35].

The evidence in this case shows no failure on the part of Dordoni in the performance of his duties, except perhaps that he did not check SEVIS when advising Doe of his travel status. Dordoni provided accurate information to the iStart software program which is used by WKU to track the status of international students enrolled at the university. Dordini is not responsible for the for the apparent glitch in the software program which caused Doe's status to show as terminated in SEVIS. After the glitch was discovered, other WKU personnel undertook efforts to fix it. After the fix was tested and checked, it was determined the iStart program was a reliable method for maintain records of international students. Certainly, there is no evidence to suggest Dordoni's reliance on the program was unreasonable. Perhaps someone else was negligent in causing the SEVIS program to show Doe as terminated, but there is nothing to show that it had anything to do with any action of Dordoni's.

The only possible failure shown by the evidence was that Dordoni did not verify Doe's immigration status in SEVIS in addition to checking it in iStart. Assuming that was indeed a failure, it was a failure in the performance of a discretionary function. Where an "act may be performed in one or two or more ways," there is discretion in the performance of that duty. *Haney v. Monskey*, 311 S.W.3d 235, 240 (Ky. 2010) (citing *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959)). As Dordoni notes, "no university policy required Dordoni to verify Doe's status in SEVIS rather than iStart." [DN 82-1 at 14]. Thus, it was up to the will and judgment of Dordoni to decide how to perform the act he was called upon to perform. He used his discretion, personal deliberation and judgment, and decided to check Doe's status in iStart only.

9

Because the Court finds that the challenged conduct is discretionary, Dordoni is entitled to qualified official immunity. Consequently, it is unnecessary to address Dordoni's remaining arguments in support of summary judgment. Additionally, it is unnecessary to address the parties' respective motions to exclude expert testimony. Dordoni's Motion for Summary Judgment is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [DN 82] is **GRANTED**, Plaintiff's Motion to Exclude Expert Witness Testimony [DN 81] is **DENIED** as moot, and Defendant's Motion to Exclude Expert Witness Testimony [DN 85] is **DENIED** as moot.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge
United States District Court

August 12, 2019

cc: counsel of record